IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JAMES ZANKEL, as Administrator of the ESTATE OF JUSTIN D. ZANKEL, DECEASED and JAMES and BARBARA ZANKEL, in their own right,

        Plaintiffs,

        v.

UNITED STATES OF AMERICA and WILLIAM E. DREYER

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.: 06-0308

## <u>MEMORANDUM OPINION</u>

CONTI, District Judge

       Plaintiffs James Zankel, as administrator of the estate of Justin D. Zankel, deceased and James and Barbara Zankel in their own right ("plaintiffs") commenced this civil action as a wrongful death and survival action pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671 et seq. ("FTCA"), against the United States of America (the "government") and Staff Sergeant William E. Dreyer, a military recruiter for the United States Marine Corps ("Dreyer").[1] Plaintiffs allege that twelve-year-old Justin Zankel was struck by a government-owned vehicle operated by Dreyer, and that Justin Zankel's death resulted from injuries sustained in that collision. Plaintiffs assert that Dreyer was negligent, careless, and reckless in the operation of his vehicle at the time of the accident. Plaintiffs argue that the government is vicariously liable for the acts or omissions of Dreyer under the FTCA.

---

[1] This case previously was stayed while defendant Dreyer was deployed to Iraq.

Dreyer filed a motion to certify that he was acting within the scope of his employment at the time of the accident and to substitute the government as defendant pursuant to 28 U.S.C. § 2679 (d)(3). This court has jurisdiction to decide Dreyer's motion to certify pursuant to 28 U.S.C. § 2679, and if the court finds that Dreyer was acting within the scope of his employment at the time of the accident, will have jurisdiction of the underlying civil action under the FTCA pursuant to 28 U.S.C. § 1346(b). The government filed a motion to dismiss for lack of subject-matter jurisdiction, or in the alternative summary judgment in the government's favor, asserting that Dreyer was not acting within the scope of his employment when the vehicle he was operating struck Justin Zankel. At a hearing held on January 3, 2007, this court denied without prejudice the government's motion and ordered discovery on Dreyer's motion to certify limited to the scope of employment issue. Following discovery, the government filed a second motion to dismiss or for summary judgment, and plaintiffs filed a motion for summary judgment on the scope of employment issue. This court heard oral arguments by the parties on October 9, 2007, and concluded that it could not grant the motion to dismiss or grant summary judgment because there were genuine issues of material fact in dispute. The summary judgment motions and the motion to dismiss were denied at the hearing held on October 9, 2007. In order to resolve the scope of employment issue for purposes of determining jurisdiction and Dreyer's motion for certification, the court, on January 3, 2008, held an evidentiary hearing. On February 15, 2008, the parties filed proposed findings of fact and conclusions of law.

This court makes the following findings of fact and conclusions of law.

# I. FINDINGS OF FACT

## A. Dreyer's Marine Corps Background

1. Dreyer enlisted in the United States Marine Corps ("Marine Corps") on July 27, 1995, and remained on active duty until his discharge on November 5, 2007. Gov't's proposed findings of fact ("Gov't's fof") ¶ 1.

2. Dreyer's primary military occupational specialty was field wireman, a communications position. From 1995 through 2001, Dreyer served in a number of different communications billets in the Marine Corps at various duty stations around the world. Id. ¶¶ 2-3.

3. In 2001, Dreyer was selected by the Marine Corps for recruiting duty and attended recruiter's school in San Diego, California, where he successfully graduated. Id. ¶ 4.

4. In January 2002, Dreyer reported for duty with the 1st Marine Corps District headquartered in Garden City, New York, and was initially assigned to recruiting duty in Cape Cod, Massachusetts, where he remained until Janurary 2003. Id. ¶ 5.

5. In January 2003, Dreyer was transferred to Recruiting Station Pittsburgh ("RS Pittsburgh") as a recruiter. Id. ¶ 6.

6. Dreyer was assigned to Permanent Contact Station ("PCS") Sharon as a basic canvassing recruiter from January 2003 until October 2004. Id. ¶ 13.

7. In December 2003, Dreyer was promoted to the rank of Staff Sergeant. Id. ¶ 7.

8. In October 2004, Dreyer was promoted to Staff Non-Commissioned Officer in Charge ("SNCOIC") or Station Commander of Recruiting Substation Butler ("RSS Butler"). Id. ¶ 13.

**B. Organizational Structure of RS Pittsburgh and Surrounding Substations**

9.      RS Pittsburgh is a subordinate recruiting command under the control and supervision of the 1ˢᵗ Marine Corps District, Garden City, New York.  Id. ¶ 8.

10.     From June 2003 through June 2006, RS Pittsburgh was commanded by Major Michael Sherman ("Sherman"), who was Dreyer's immediate supervisor.  Id. ¶ 9.

11.     RS Pittsburgh is headquartered in the Federal Building, located in downtown Pittsburgh, Pennsylvania, and has control over the following nine substations that are responsible for recruiting in Western Pennsylvania: Butler, Beaver, Greensburg, Johnstown, Ross Park, State College, Susquehanna, Three Rivers, and Uniontown. Id. ¶ 10.

12.     Each substation is commanded by a mid-level enlisted Marine referred to as a Staff Non-Commissioned Officer in Charge ("SNCOIC") or Station Commander who during the relevant time period reported directly to Sherman. Id. ¶ 11.

13.     Under each substation are a number of smaller recruiting stations called permanent contact stations ("PCS"); under RSS Butler, there are two PCSs–one located in Sharon, Pennsylvania, and the other in New Castle, Pennsylvania. Id. ¶ 12.

14.     As SNCOIC of Substation Butler, Dreyer's primary office was located at Substation Butler.  Dreyer also maintained responsibilities and traveled to PCS Sharon and PCS New Castle. Id. ¶ ¶ 12-15.

**C. Dreyer's Responsibilities as SNCOIC of RSS Butler**

15.     Dreyer's main responsibility was to train and supervise his canvassing recruiters. Id. ¶ 14.

16.     The work hours for a typical recruiter were flexible and varied; however, normal working hours for recruiters were from approximately 8:00 a.m. to 7:00-9:00 p.m. in the evening.  Id. ¶ 22.

17.     In an attempt to meet mission goals, SNCOIC Dreyer's work often exceeded these hours, including working Saturdays and Sundays. Plaintiffs' and Dreyer's joint proposed findings of fact ("Dreyer's fof") ¶ 17.

18.     At the time of the accident, SNCOIC Dreyer's area of responsibility included portions of Butler, Lawrence, Venango, and Mercer Counties.  Id. ¶ 2.

19.     As SNCOIC of RSS Butler, Dreyer had no time restrictions dictating the hours he could work per day.  The only geographical restrictions placed on Dreyer were that he could not engage in recruiting activities in an asset assigned to another recruiting substation, such as a high school or a community college. Id.  ¶ 3.

20.     An SNCOIC of a substation has the authority to make certain discretionary decisions in order to meet his mission objectives.  Transcript of evidentiary hearing January 3, 2008 ("T.") at 167, 275-76.

     **D.  Use of Government Vehicles by Recruiters and Dreyer**

21.     Each Marine Recruiter is assigned a government vehicle in order to perform the recruiting mission, and these vehicles are to be used only for official government purposes.  Gov't's fof ¶¶ 23-24.

22.     Dreyer understood the procedures and authorized uses for government vehicles. Id. ¶ 25.

23.     Dreyer was assigned and primarily drove a 2004 Chevy Cavalier, VIN Number 3G1JC52674S163651 ("government vehicle"), from approximately May 2004 through the time of the accident on January 27, 2005.  Id. ¶ 26.

24.     Government vehicles are an important asset for the recruiting mission.  T. at 164, 203.

25.     A government vehicle is an integral and important part of a Marine recruiter's job. The  recruiter must travel to all parts of his assigned area as well as transport recruits.  Dreyer's fof ¶ 5.

26.     Recruiters are required to use a government vehicle when traveling as part of the job.  Each recruiter is assigned a vehicle, and Dreyer was provided with a government credit card for gas and incidentals related to his government vehicle.  The use of a vehicle is essential and necessary to the accomplishment of the recruiting mission.  Id.

27.     Marine recruiters are not permitted to use their personal vehicles to perform their recruiting-related duties.  Id. ¶ 6.

28.     Marine Corps personnel are not permitted to use government vehicles to travel between their duty post and residence ("domicile-to-duty" use or "DTD").  Id. ¶ 7.

29.     There are two exceptions to the rule prohibiting DTD use of a government vehicle applicable here:  (1) if a Marine recruiter obtained DTD written authorization from the Commanding Officer of the 1st Marine Corps District to use a government vehicle for commuting purposes or (2) if a Marine recruiter obtained twenty-four hour temporary DTD permission from the Commanding Officer of RS Pittsburgh.  Gov't's fof ¶ 38.

30.     Dreyer did not have DTD written authorization permitting him to use his government vehicle for commuting purposes.  Id. ¶ 39.

31.     Sherman, as the Commanding Officer of RS Pittsburgh, had the authority to grant Dreyer temporary DTD.  Id. ¶ 40.

32.     All RS Pittsburgh Marines were instructed that temporary DTD transportation was granted by Sherman through verbal authorization by calling him on the phone and explaining the circumstances requiring the temporary DTD use of the government vehicle.  Id. ¶ 41.

33.     Marines were even permitted to leave a message on Sherman's voice mail, and this would constitute temporary DTD authority.  Id. ¶ 44.

34.     Sherman considered requests for temporary DTD authorization utilizing criteria that included such factors as safety, efficiency, and recruiting-related use.  Sherman considered the safety of the individual the most important factor.  Dreyer's fof ¶ 9.

35.     Sherman testified that he routinely received temporary DTD requests (two to three per week) and they would typically be granted.  Sherman only denied about one dozen requests over a three-year period.  Gov't's fof 10.

36.     Sherman stated that he previously authorized the personal use of a government vehicle in such cases where:  (1) a Marine's vehicle broke down, and he had no other transportation; (2) a Marine's wife went into labor, and the Marine needed to quickly drive to the hospital; and (3) a Marine's child was hurt at school, and his immediate presence was required.  Id. ¶ 48.

37.     Dreyer understood the temporary DTD procedures.  Id. ¶ 53.

### E. Circumstances Leading Up to the Accident

38.     Dreyer was struggling as the SNCOIC of RSS Butler, and he was not meeting his recruiting quotas.  After October 2004 while Dreyer was the SNCOIC of RSS Butler, RSS Butler met its mission objectives (number of contracts signed and recruits shipped to basic training) during only one month - December 2004.  Dreyer worked every day in December 2004 in an attempt to accomplish his mission objectives.  On January 10, 2005, Sherman issued a formal reprimand, a letter of concern, to Dreyer concerning RSS Butler's substandard performance and inability to meet monthly mission objectives. Dreyer was required to not only meet his previously assigned contract and shipping quotas, but to write an additional ten contracts in the month of January 2005 or suffer further consequences.  Dreyer's fof ¶ 17; T. at 38-41, 89-99, 177-80.

39.     At the end of January 2005, RSS Butler had only obtained one contract for the month, and was substantially behind in the recruiting mission.  Dreyer was working between sixteen and eighteen hours per day in an attempt to meet the recruiting mission and avoid further disciplinary action from Sherman.  Dreyer spent long hours focusing on his recruiting activities and his mission.  Dreyer's fof ¶ 18.

40.     Master Gunnery Sergeant Epps ("Epps") was a recruiting instructor with 27 years of experience.  Epps was assigned to RS Pittsburgh and assisted struggling recruiters. Gov't's fof ¶ 89.

41.     Because of RSS Bulter's substandard performance, Dreyer received training from Epps at the Butler substation on January 26, 2005, and was scheduled to receive training from Epps at the Butler Substation on January 27, 2005.  T. at 40-41, 43, 122-25, 244-45.

42.     On the morning of January 26, 2005, Dreyer departed his residence in Baden, Pennsylvania, and drove his personally owned vehicle ("personal vehicle") to PCS Sharon, where he arrived at approximately 6:30 a.m. Gov't's fof ¶ 58.

43.     At PCS Sharon, Dreyer parked his personal vehicle and drove his government vehicle to RSS Butler, where he worked all day.  Id. ¶ 59.

44.     At approximately 9:45 p.m., on January 26, 2005, Dreyer left RSS Butler and drove back to PCS Sharon in order to pick up his personal vehicle for the drive home. Id. ¶ 60.

45.     At 10:45 p.m. on January 26, 2005, Dreyer arrived at PCS Sharon and discovered that his personal vehicle would not start.  Id. ¶ 61.

46.     Dreyer decided to use the government vehicle to drive home and return to RSS Butler the following morning without first obtaining temporary DTD permission from Sherman.  Dreyer's fof ¶ 20.

47.     Dreyer did not call Sherman to receive temporary DTD driving permission on January 26 or January 27, 2005.  Gov't's fof ¶ 63.

48.     Dreyer stated that he did not call for temporary DTD permission because it was "late at night," and he did not want to bother Sherman.  Id. ¶ 68; T. at 148.

49.     As Station Commander, Dreyer believed he had discretion to make the decision to drive the government vehicle January 26-27, 2005.  T. at 46:8.

50.     Dreyer believed, had he called Sherman the night of January 26, 2007, that Sherman would have granted the temporary DTD under those circumstances.  Id. 108:18.

51.     Had Dreyer called Sherman for permission during the night of January 26, 2005, Sherman under the circumstances would have granted DTD permission to Dreyer.  Id. at 190:11; 200:18; 264.

52.     Dreyer arrived at his home in Baden, Pennsylvania, at midnight on  January 26, 2005, ate dinner, and went to bed.  Gov't's fof ¶ 75.

53.     Dreyer drove directly home and did not stop anywhere or perform any personal errands.  Dreyer's fof ¶ 27.

54.     On January 27, 2005, Dreyer left his home in Baden, Pennsylvania, at approximately 6:35 a.m. and began to drive to RSS Butler in his government vehicle in order to meet Epps for his required training session.  Id. ¶ 29.

55.     At approximately 6:40 a.m. on January 27, 2005, Dreyer, while driving his government vehicle, was involved in an accident that resulted in the death of Justin Zankel.  Gov't's fof ¶ 77.

56.     Between the time Dreyer departed his home and the time of the accident, Dreyer did not stop anywhere, perform any errands, or use the vehicle for any personal matter.  Dreyer's fof 33.

## II.  CONCLUSIONS OF LAW

### A.  The FTCA

1.     The FTCA provides a waiver of sovereign immunity for certain tort claims against the United States.  While the United States generally enjoys sovereign immunity from lawsuits seeking money damages, the United States may waive sovereign immunity and allow itself to be sued if it does so unequivocally in a statute.  See Matsko v. United States, 372 F.3d 556, 558 (3d Cir. 2004)(citing FDIC v. Meyer, 510 U.S. 471, 475

10

(1994); <u>Dep't of the Army v. Blue Fox, Inc.</u>, 525 U.S. 255, 261 (1999)). "The FTCA is the statute that waives immunity, in part, for tort claims against the United States." <u>Matsko</u>, 372 F.3d at 558 (citing 28 U.S.C. § 2674 ("[t]he United States shall be liable [with a few exceptions], respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances")).

2.      Under the FTCA, an action against the United States provides the exclusive remedy for non-constitutional torts based upon the "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 2679(b)(1); <u>see</u> <u>Couden v. Duffy</u>, 446 F.3d 483, 498 (3d Cir. 2006)(citing <u>Castro v. United States</u>, 34 F.3d 106, 110 (2d Cir.1994) (finding that "a claimant's exclusive remedy for non-constitutional torts by a government employee acting within the scope of his employment is a suit against the government under the FTCA")).

3.      In this case, the pending dispute concerns whether Dreyer was acting "within the scope of his office or employment" when the vehicle he was operating struck Justin Zankel.  28 U.S.C. § 2679(b)(1).  The FTCA expressly includes "members of the military or naval forces of the United States" in defining "employee of the government."  <u>Id.</u> § 2671.  In addition, the FTCA provides that "'[a]cting within the scope of his office or employment' in the case of a member of the military or naval forces of the United States . . . means acting in line of duty."  <u>Id.</u>

**B. Scope of Employment**

4.      Whether acts or omissions are within the scope of employment is a question to be answered by the law of the state where the acts or omissions occurred.  28 U.S.C. § 1346(b)(1).  Because this accident occurred in Pennsylvania, Pennsylvania law governs the scope of employment question.

5.      The Pennsylvania Supreme Court has long recognized the presumption that the use of a business vehicle is presumed to be for its owner, the employer.  Gojkovic v. Wagely, 278 Pa. 488 (1924).  That presumption, however, can be rebutted by evidence presented by the employer, the credibility of which is to be determined by the jury or fact finder.  Id.

In this case, it is unquestioned that Dreyer was driving a government-owned vehicle at the time of the accident.  The evidence provided by the government to rebut the presumption concerned the "domicile-to-duty" policy.  The government presented written policies as well as testimony of Sherman, testimony of Dreyer himself, as well as testimony of two other SNCOIC  that the government's policy was to not allow recruiters to drive government vehicles from work to home and back without permission.  Dreyer presented evidence that the policy was not strictly enforced and Sherman would grant requests as a matter of course.  Dreyer incorrectly thought that he had authority to grant domicile-to-duty requests for the locations he oversaw, and that he could grant permission for himself to drive the government vehicle home the night before the accident.  Even if his belief was incorrect, Dreyer argues that if he had asked permission from Sherman in this particular case it would have been granted.

The government's evidence relating to this policy is sufficient to overcome the presumption that the use of the government vehicle was for the government. With the presumption rebutted, the burden shifts to Dreyer to prove that he was acting within the scope of his employment at the time of the accident.

6.      Whether Dreyer was authorized to drive the government vehicle at the time of the accident is not dispositive. The Pennsylvania Supreme Court has adopted section 230 of the Restatement of Agency which recognizes that unauthorized or even specifically forbidden acts can be within the scope of employment. Mautino v. Piercedale Supply Co., 13 A.2d 51, 54 (Pa. 1940); see Aliota v. Graham, 984 F.2d 1350, 1358 (3d Cir. 1993). Section 230 provides:

> § 230. Forbidden Acts
> An act, although forbidden or done in a forbidden manner,
> may be within the scope of employment.

7.      In determining whether an unauthorized act is within the scope of employment, Pennsylvania courts have relied upon section 228 of the Restatement (Second) of Agency. The United States Court of Appeals for the Third Circuit in Matsko noted:

> We assess whether [a government employee] was acting
> within the scope of his employment under the law of
> Pennsylvania, because that is where the incident occurred.
> See 28 U.S.C. § 1346(b)(1); see also Aliota v. Graham, 984
> F.2d 1350, 1358 (3d Cir.1993). In Pennsylvania, courts
> apply the Restatement (Second) of Agency's § 228 to
> determine whether conduct is within the scope of
> employment. Section 228 considers four prongs indicative
> of conduct within the scope of employment: (1) the
> conduct is of the kind the employee is employed to
> perform; (2) the conduct occurs within the time and space
> of employment; (3) the conduct is actuated at serving the
> employer; and (4) any force used is foreseeable by the

> employer.  <u>Fitzgerald v. McCutcheon</u>, 270 Pa.Super. 102,
> 410 A.2d 1270, 1272 (1979) (citing § 228).

<u>Matsko</u>, 372 F.3d at 559.  The court commented that "[u]nless the litigant satisfies each

prong, the court will conclude that the act in question was not within the scope of

employment."  <u>Id.</u>[2]

8.    Section 228 (general statement) of the Restatement (Second) of Agency provides:

> (1) Conduct of a servant is within the scope of employment
> if, but only if:
>
> (a) it is of the kind he is employed to perform;
>
> (b) it occurs substantially within the authorized time and
> space limits;
>
> (c) it is actuated, at least in part, by a purpose to serve the
> master, and
>
> (d) if force is intentionally used by the servant against
> another, the use of force is not unexpectable by the master.
>
> (2) Conduct of a servant is not within the scope of
> employment if it is different in kind from that authorized,
> far beyond the authorized time or space limits, or too little
> actuated by a purpose to serve the master.

**(1)  <u>The conduct is of the kind the employee is employed to perform.</u>**

9.    Dreyer's conduct at the time of the accident was of the kind he was employed to

perform.  Dreyer was issued a government vehicle and was required to drive the

government vehicle in his job as a Marine Recruiter and Station Commander for the

Marine Corps.  Driving a vehicle is an integral and necessary part of Dreyer's

---

[2]The fourth factor, whether any force used is foreseeable by the employer, is not
implicated here.  The accident was not the result of intentional force against another person, but
rather resulted from alleged negligence of Dreyer.

employment with the Marine Corps. The government's witnesses described the government vehicle as an important asset in accomplishing the recruiting mission. Upon consideration of the evidence presented the court finds that Dreyer met his burden with respect to prong one of the scope of employment test set forth in section 228 of the Restatement (Second) of Agency.

10.    The government argues that Dreyer's conduct fails this test largely because he drove the government vehicle without authorization. The government cites Orluske v. Nash Pittsburgh Co., 133 A. 148, 149 (Pa. 1926), as precedent for finding an activity is not within the scope of employment when employees utilize their employer's vehicle without authorization. In Orluske, the Pennsylvania Supreme Court upheld judgment for the defendant in that case notwithstanding a jury verdict for the plaintiff where the plaintiff sued a car dealership after being struck by a vehicle owned by the car dealership and driven by one of its employees without authorization. Id. The court upheld judgment for the defendant because the undisputed evidence showed that the employee was without authority to operate the vehicle and was not acting within the scope of employment. Id.

This case is distinguishable from Orluske for two reasons. First, Orluske was decided before the Pennsylvania Supreme Court adopted section 230 of the Restatement (Second) of Agency. Mautino, 13 A.2d at 54. Section 230 explicitly provides that unauthorized or even specifically forbidden acts can be within the scope of employment. Second, in Orluske, evidence offered by the employee concerning the scope of the employee's authority to operate the vehicle was excluded by the court. Orluske, 133 A.

at 149.  Here, plaintiffs and Dreyer presented substantial evidence to dispute the

significance of the government's assertion that Dreyer was not authorized to operate the

vehicle at the time of the accident.  While the government has established that Dreyer

violated the domicile-to-duty policy of the Marine Corps when he used his government

vehicle to drive home and back to RSS Butler on January 26 and 27, 2005, the court finds

that the violation was merely a technical violation because  the circumstances in this case

satisfy the criteria Sherman used when granting temporary DTD requests.  Sherman

routinely granted similar requests, because it was in the best interest of the government

and helped the individual recruiter complete the Marine Corps recruiting mission.  A

request could be granted by merely leaving a message on Sherman's voice mail.  This

case is no different.  Under the circumstances, Sherman would have granted the

temporary DTD request had Dreyer called Sherman the night of January 26, 2005.  This

court concludes that Dreyer's failure to call Sherman does not by itself take Dreyer's

actions out of the scope of his employment with the Marine Corps.

**(2) <u>The conduct occurred within the time and space of employment.</u>**

11.     Dreyer's conduct at the time of the accident was within the time and space of

employment.  Dreyer had no time or space restrictions placed on him by the Marine

Corps.  Dreyer was a Station Commander at RSS Butler, and supervised the recruiters in

PCS Sharon and PCS New Castle.  Dreyer's geographic area of coverage included parts

of Butler, Lawrence, Venango, and Mercer counties, and included the area of the

accident.  Likewise, Dreyer had no time restrictions placed on him.  Dreyer had been

working very long hours in an attempt to meet his recruiting quotas and accomplish his

mission.  The Marine Corps, through Sherman, encouraged Dreyer to do whatever it took to meet his mission, and Sherman acknowledged that Dreyer faced further consequences if he did not meet his mission for January 2005.  Additionally, Dreyer was driving to RSS Butler at the time of the accident in order to arrive early and prepare for his mandatory meeting and training with Epps.  Upon consideration of the evidence presented the court finds that Dreyer met his burden with respect to prong two of the scope of employment test set forth in section 228 of the Restatement (Second) of Agency.

### (3) **The conduct was actuated at least in part to serving the employer.**

12.     Dreyer's use of the government vehicle on the evening of January 26, 2005 and the morning of January 27, 2005 was actuated at least in part to serving the Marine Corps.  Dreyer was behind in his recruiting mission and was spending long hours every day attempting to meet the government's mission.  Use of the government vehicle under the circumstances in this case not only enabled Dreyer to travel to and from work after his car broke down late in the evening, but it also enabled Dreyer to attempt to meet the Marine Corps' recruiting goals.  After working sixteen hours trying to meet his recruiting quotas and avoid further discipline from Sherman, Dreyer was unable to start his car 55 miles from his home.  Dreyer met the criteria set out by Sherman to obtain temporary DTD and decided to drive the government vehicle home.  Dreyer was motivated at least in part with his desire to meet his recruiting goals by returning home and getting to RSS Butler early the next day to prepare for his mandatory meeting with Epps.  On the morning of January 27, 2005 Dreyer needed to return the government vehicle to a government facility and he had to meet with Epps early that morning.

13.     Several courts have considered the scope of employment issue involving military recruiters and whether the recruiter's conduct at the time was actuated to serve the interests of the military.  In Keener v. Department of the Army, 498 F.Supp.1309 (M.D. Pa. 1980), the court found that the recruiter was not acting within scope of his employment when the recruiter drove a government vehicle to an NCO club.  The recruiter had been drinking at a seminar before driving to the NCO club, had been told to leave the vehicle at the seminar, not to drive within eight hours of consuming intoxicating beverages, and had no clearance to drive.  In Simpson v. United States, 484 F.Supp. 387 (W.D. Pa. 1980), the court found that the recruiter was acting within the scope of his employment when the recruiter drove his vehicle back and forth from the recruiting station to his home.  The recruiter was transporting civilian recruits at the time of the accident and was "furthering interests of the government in recruiting marines" at that time.

       The government argues this case is like Keener where the recruiter did not have authorization to drive the vehicle at the time of an accident, and in fact was instructed not to drive after drinking, to leave the military vehicle parked at the seminar location, and not to leave the seminar in a government vehicle during the course of the seminar, and is distinguishable from Simpson where the recruiter had domicile-to-duty privileges, had been instructed the job was 24 hours per day, and was engaged in recruiting duties at the time of the accident.

In Keener, the court noted that the recruiter was not authorized to use the vehicle in question, but refused to determine the "within the scope of employment issue" on that basis alone:

> The existence of the army regulations, however, makes [the recruiter's] operation of the vehicle at that time unauthorized. Because neither [the recruiter] nor his immediate superiors were aware of those regulations, the Court is unwilling to rest its conclusion on that basis alone.

Keener, 498 F.Supp. at 1315. The court continued:

> The most important reason why [the recruiter] was not acting within the scope of his employment is that his activity at that time was not "actuated at least in part by a purpose to serve the master" but instead his conduct was "too little actuated by a purpose to serve the master."

Id. (quoting Restatement (Second) Agency § 228). The court in Keener distinguished Simpson as follows:

> This case is distinguishable from that of Simpson v. United States, 484 F.Supp. 387 (W.D. Pa. 1980). The marine recruiter in that case had been ordered to engage in recruiting on a 24-hour basis in order to meet his quota. At the time of the accident, he was transporting three civilians from a local bar after he had been discussing recruiting with them. In that case, it could fairly be said that the recruiter's conduct was to serve the purpose of the United States. Such cannot be said in this case where there is no evidence that the trip by Sergeant Ludwig was motivated to engage in recruiting or to improve his recruiting skills. The trip was solely for personal pleasure.

Id. In this case, like in Simpson, Dreyer, who under the circumstances would have been granted temporary DTD, was spending long hours recruiting in an attempt to meet his

recruiting quotas, was returning the vehicle to a government facility, and was on his way to a mandatory meeting with Epps. The facts presented warrant a finding that the vehicle's use to return it to a government facility was actuated at least in part to serve the government. The government vehicle could not be kept at Dreyer's home indefinitely; it needed to be returned to a government facility. Where the use of the government vehicle under the circumstances present would have been permitted by Sherman, the return of the vehicle was actuated at least in part to serve the government's interests. Upon consideration of the evidence presented the court finds that Dreyer has met his burden with under prong three of the scope of employment test set forth in section 228 of the Restatement (Second) of Agency by proving that his conduct was actuated at least in part to serve the government.

### (4) Exceptions to the Commuting Rule

14.     The government submits that Dreyer was merely using the government vehicle to commute to work and cites to parts of comment d of section 229 of the Restatement (Second) of Agency as creating a general rule that an employee is not in the scope of his employment while commuting to and from work. Comment d provides as follows:

> *d. Going to and from work.* If the master supplies a servant with a vehicle in order that the servant may go to or from work, it is important to ascertain whether the vehicle is supplied primarily for the purpose of assisting the master's work or for the purpose of assisting the employee to perform what is essentially his own job of getting to or from work. The mere fact that the employer supplies a vehicle does not establish that those who avail themselves of it are within the scope of employment while upon it, especially if the use is merely casual. On the other hand, the fact that the master contracts to supply a vehicle or that the supplying of a means of access to the work is one of the inducements to the employment indicates that the operation of the vehicle is part of the master's work. If employees are required to use a particular vehicle and particularly if they are paid

20

> while in it, it would ordinarily be found that the driver of the vehicle is acting as the employer's servant.

This court does not interpret this comment as creating an absolute commuting rule and notes the applicability of exceptions if an employee was "required to use a particular vehicle" and was "paid while in it."

In <u>Williams v. Rene</u>, 72 F.3d 1096 (3d Cir. 1995), the Court of Appeals for the Third Circuit considered comment d of section 229 and recognized a general rule (under Virgin Islands law) that employees are not within the scope of their employment while traveling to and returning from work. The court of appeals in <u>Williams</u> noted, however, that "[t]here may be some circumstances that take a case out of the general rule, for example, when there are express instructions by the employer or when the trip serves some specific purpose of the employer other than merely providing for the presence of the employee at the work place." <u>Williams</u>, 72 F.3d at 1100. In <u>Williams</u>, the court found that an employee was not within the scope of his employment while driving to work in a company car assigned to a co-employee. <u>Id.</u> The court determined that although the plaintiff presented some evidence that at various times in the past some employees had been authorized to drive to employees' homes to pick them up, <u>there was no clear policy</u> and the evidence did not establish the employee was within the scope of employment at the time of the accident; instead, evidence supported a finding that the employee used the vehicle for his personal convenience and not the business of the employer. <u>Id.</u> at 1100-01.

In this case, there is a clear policy concerning Marine recruiters using a government vehicle to drive from their residence to their duty post. The domicile-to-duty rule established criteria and a procedure by which a recruiter could obtain temporary DTD permission, which, if granted, may implicate that the recruiter was acting within the scope of employment when commuting to work.

15.     The government excised comment d from section 229 of the Restatement (Second) of Agency without considering it in the context of section 229 overall. Section 229 (Kind Of Conduct Within Scope Of Employment) provides:

> (1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized.
>
> (2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:
>
> (a) whether or not the act is one commonly done by such servants;
>
> (b) the time, place and purpose of the act;
>
> (c) the previous relations between the master and the servant;
>
> (d) the extent to which the business of the master is apportioned between different servants;
>
> (e) whether the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;
>
> (f) whether or not the master has reason to expect that such an act will be done;
>
> (g) the similarity in quality of the act done to the act authorized;

(h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;

(i) the extent of departure from the normal method of accomplishing an authorized result; and

(j) whether or not the act is seriously criminal.

If the court assumes that the conduct of Dreyer in using the government vehicle was unauthorized, the facts of this case need to be analyzed under the ten factors described in section 229 in order to determine whether that unauthorized conduct was nevertheless within the scope of Dreyer's employment. Each factor will be discussed.

### (a) whether or not the act is commonly done by such servants

The evidence of record established that Sherman routinely granted domicile-to-duty requests, and received requests several times a week over several years. It was certainly common for recruiters to obtain temporary DTD permission and use their government vehicles for going to and coming from the recruiting substations.

### (b) the time, place and purpose of the act

Dreyer was within the time and space limitations of his position as a Station Commander in the Marine Corps. He had been working long hours attempting to meet the government's recruiting goals, and at the time of the accident needed to return the vehicle to a government facility and was on his way to a mandatory meeting with Epps.

### ( c) the previous relations between the master and the servant

Because of Dreyer's experience as a recruiter, he understood the importance of meeting the recruiting mission and knew that he needed to meet or exceed his quota or face disciplinary action. Because of his relationship with Sherman, Dreyer also

understood Sherman's criteria for granting temporary DTD, knew that his situation met those criteria, and believed that had he asked Sherman, Sherman would have granted temporary DTD. The previous relations between the master and servant indicated that Dreyer would have been granted temporary DTD.

**(d) the extent to which the business of the master is apportioned between different servants**

Dreyer was responsible as the Station Commander for meeting the recruiting mission and was the only person assigned the particular government vehicle in question.

**(e) whether the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant**

Driving a vehicle is within the enterprise of the government - the recruiting mission - and it was recruiters, including Dreyer, who were entrusted to drive vehicles and who were granted temporary DTD permission in circumstances similar to those faced by Dreyer on the evening of January 26, 2005.

**(f) whether or not the master has reason to expect that such an act will be done**

The government has reason to expect that a recruiter under the circumstances Dreyer faced would be granted temporary DTD and that a recruiter like Dreyer could be involved in an accident while driving a government vehicle. Dreyer was required to drive extensively and was under tremendous pressure to meet the mission. The Marine Corps anticipated situations where it would be appropriate for a recruiter to use a

government vehicle to return the vehicle to a government location and created the domicile-to-duty regulations and the temporary DTD exception to help recruiters succeed in their recruiting mission.

### (g) the similarity in quality of the act done to the act authorized

This factor does not seem relevant or useful in this particular case. One could argue that the act done - driving the government vehicle to attend a scheduled meeting - is similar in quality to the act of driving the government vehicle during regular working hours.

### (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant

It is undisputed that the government supplied the vehicle involved in the accident to Dreyer. The vehicle was assigned to him, and he was given a credit card to cover any expenses related to the government vehicle.

### (i) the extent of departure from the normal method of accomplishing an authorized result

The extent of departure is minimal in this case. Dreyer met Sherman's requirements for obtaining temporary DTD permission, he simply did not call and leave a message on Sherman's voice mail. Dreyer believed and Sherman confirmed that under the circumstances in this case DTD permission would have been granted.

### (j) whether or not the act is seriously criminal

There is no indication in this case that Dreyer's actions were criminal.

After considering all the factors set forth in section 229(2) of the Restatement (Second) of Agency, the court finds that even if Dreyer's actions were unauthorized, Dreyer's conduct was so similar to or incidental to the conduct authorized as to be within the scope of employment.

16.     The government failed to acknowledge comment a of section 229 which states in relevant part:

> The *limits of the scope of employment* are dependent upon the facts of the particular case, and *no more definite statement can profitably be made concerning them than that made in Subsection (2)*. Since the phrase "scope of the employment," is used for the purpose of determining the liability of the master for the conduct of servants, *the ultimate question is whether or not it is just that the loss resulting from the servant's acts should be considered as one of the normal risks to be borne by the business* in which the servant is employed.

Restatement (Second) of Agency § 229, cmt. a (emphasis added).  Using a government vehicle is an essential part of the recruiting mission.  Both Dreyer and his canvassing recruiters are required to drive extensively for recruiting activities and transporting recruits.  Dreyer was required to drive his government vehicle when performing recruiting duties, and was working long hours attempting to meet the recruiting quotas set by the government.  Temporary DTD was routinely granted to recruiters.  Under the circumstances presented in this case, it is just that the risk associated with Dreyer's driving the government vehicle should be considered one of the normal risks to be borne by the government in the difficult and demanding business of recruiting Marines.

## III. CONCLUSION

17.     After considering and weighing all the evidence presented by the parties and applying the controlling law to the court's factual findings, this court finds, although it is a close question, that Dreyer was acting within the scope of his employment with the Marine Corps at the time of the accident on January 27, 2005. Pursuant to the Westfall Act, 28 U.S.C. § 2679(d)(3), the court certifies that Dreyer was acting within the scope of his employment and orders that the United States is hereby substituted as defendant for William E. Dreyer and that William E. Dreyer is hereby dismissed as a defendant in this case. The court finds that this court has subject-matter jurisdiction over plaintiffs' claim under the FTCA, because Dreyer was within the scope of his employment with the government at the time of the accident underlying plaintiffs' claim.

By the court,


/s/ Joy Flowers Conti
Joy Flowers Conti

Dated:   March 25, 2008                United States District Judge




cc:     Counsel of Record